UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No.: 17-944(DSD/DTS)


Tanya L. Campbell,

                Plaintiff,
                Counter-Defendant,

v.                                                    **ORDER**

St. Jude Medical, S.C., Inc.

                Defendant,
                Counter-Plaintiff.


        Barry S. Fagan, Esq. and Fagan McManus, P.C., 25892 Woodward
        Avenue, Royal Oak, MI 48067 and Susan E. Ellingstad, Esq. and
        Lockridge Grindal Nauen, PLLP, 100 Washington Avenue South,
        Suite 2200, Minneapolis, MN 55401, counsel for plaintiff and
        counter-defendant.

        Joseph W. Hammell, Esq., Courtney L. Burks, Esq. and Jones
        Day, 90 South 7th Street, Suite 4950, Minneapolis, MN 55402,
        counsel for defendant and counter-plaintiff


        This matter is before the court upon the motion for summary

judgment by defendant St. Jude Medical S.C., Inc. (SJM) and the

motion for judgment on the pleadings by plaintiff Tanya Campbell.

After a review of the file, record, and proceedings herein, and for

the following reasons, the court grants SJM's motion in part and

grants Campbell's motion.


                            **BACKGROUND**

        This employment discrimination dispute arises out of SJM's

decision to terminate Campbell's employment.   SJM is a large

medical device manufacturer.   On February 21, 2014, SJM hired

Campbell as a clinical specialist (CS) in its neuromodulation unit based in southeast Detroit. Hutson Decl. ¶ 4. SJM assigned Campbell to work with Dawn Hutson, a territory manager (TM), and Barbara Hayes and Mary Ruehl, both clinical specialists.[1] Hutson was primarily responsible for selling SJM products, and Campbell, Hayes, and Ruehl assisted Hutson by scheduling appointments, assisting physicians during procedures, programming medical devices, instructing patients regarding treatments, and organizing educational programs for physicians. Hutson Decl. ¶ 2.

Campbell and her fellow Detroit team members reported directly to the regional sales director (RSD) - initially Jim Bordogna and later John Collier. Id.; Collier Decl. ¶¶ 4-5. Thus, although Campbell's job was to support Hutson, Hutson did not formally evaluate her performance or determine her compensation. Collier Decl. ¶ 7.

By all accounts, Campbell performed very well into the fall of 2014. She was the MVP of her six-week training class and helped her team achieve sales well above their established goals. Pl.'s Exs. 9, 65; Hutson Dep. at 32:11-34:3. She also had a good working relationship with Hutson. Hutson Dep. at 38:3-18.

According to Campbell, things began to change in September 2014, after she told Collier she was pregnant and required certain

_____

[1] The CS position has three levels:  I, II, and III.  SJM hired Campbell as a CS II and Hayes and Ruehl each held the position of CS III.  Hutson Decl. ¶ 4.

medical accommodations.  Specifically, Campbell's doctor restricted her from repetitive x-ray exposure, which required her to leave the operating room while x-rays were in progress, and later restricted her travel.  Pl.'s Ex. 17 at 2; Collier Decl. Ex. H.  There is no dispute that SJM honored each of Campbell's restrictions.  Campbell asserts, however, that SJM discriminated and retaliated against her in other ways as follows.

## I.  TM Position

Campbell alleges that SJM declined to consider her for an open TM position due to her pregnancy.  Campbell had been scheduled to meet with Collier and his supervisor, Daniel Balkom, to discuss her possible move to a TM position on September 10, 2014.  Hutson Dep. at 63:15-64:9.  Hutson worked with Campbell to prepare for the interview and felt, at the time, that Campbell would be a good candidate for the position.  Id. at 63:15-64:9; 69:1-70:8.  After informing Collier of her pregnancy on September 5, however, the interview never happened.  According to Campbell, Collier told her that he was taking some time to assess the Detroit market before making changes to the team.  Campbell Dep. at 66:1-3.  Campbell remained interested in becoming a TM, but did not actively pursue the position given Collier's comments.  Id. at 66:11-67:6; Pl.'s Ex. 18.  In early December 2014, Collier hired Anthony Ball as the new TM for the Detroit team without interviewing Campbell.  Pl.'s Ex. 19.  Collier testified that Campbell called him before he hired

Ball and withdrew from consideration.  Collier Dep. at 71:23-72:1.

## II.  **Sexual Harassment Incident**

Campbell next alleges that SJM failed to adequately respond to
an incident in which she was sexually harassed by a client.  In
December 2014, a doctor at St. Joseph Mercy Hospital, Dr. Radden,
touched Campbell's stomach and pubic area and made inappropriate
comments to her.[2]  Dahl Decl. Ex. A at 1.  Campbell told Hutson
about the incident and also provided a detailed narrative to SJM's
human resources department the following day.  Id. at 1-2.
According to Campbell, Hutson told her that Dr. Radden is "perverse
in that way" and encouraged her to report the incident to HR.
Campbell Dep. at 101:2-16; Hutson Dep. at 111:11-21.  Campbell did
so and HR ultimately told her that she needed to report the
incident to the hospital because SJM did not have authority over
the doctor.[3]  Dahl Decl. ¶¶ 3-4.  HR also told Campbell that she
would not be required to work with Dr. Radden going forward.  Id.
¶ 4.  Campbell ultimately reported the incident to the hospital,
which handled the matter to her satisfaction.  Campbell Dep. at

---

[2]  Dr. Radden was a valuable SJM client who generated
approximately $1 million per year in revenue.  Ball Dep. at 57:25-
58:11.

[3]  In fact, SJM's harassment policy expressly covers
prohibited conduct by a non-employee such as a client, as was the
case here.  Pl.'s Ex. 32 at 1, 2.  The policy states that SJM will
"investigate and take timely and appropriate responsive action ...
reasonably calculated to end the objectionable conduct or
harassment."  Id. at 1-2.

121:4-24.  Although Hutson and Ball mistakenly scheduled Campbell to work with Dr. Radden after the incident on several occasions, they corrected the error each time.  Hutson Decl. ¶¶ 9-10; Collier Decl. ¶ 14; Campbell Dep. at 127:10-23.

## III. Hutson Reports Performance Issues

Despite their previously good relationship, Campbell alleges that Hutson began documenting perceived issues with Campbell's performance and reporting them to Collier in order to create a paper trail for her termination.  For example, Hutson blamed Campbell for a poorly attended client dinner on September 10, 2014, that was apparently due to flooding in the area rather than poor performance by Campbell.  Hutson Decl. ¶ 8; Hayes Decl. ¶¶ 9-13. Hutson also forwarded complaints from at least one doctor about Campbell's medical restrictions to Collier, despite SJM's purported willingness to accommodate Campbell during her pregnancy.  Hutson Dep. at 96:6-97:4.  Further, Hutson complained on numerous occasions to Collier that Campbell was unresponsive, difficult to work with, unwilling to work outside of normal business hours, and sometimes unprepared.  See Hutson Decl. ¶¶ 11-14; id. Exs. D, F; Collier Decl. ¶¶ 15-16, 21.  Although Campbell acknowledges that she and Hutson had a strained relationship, she disputes Hutson's characterization of her performance.  See Collier Decl. Ex. B.

## IV. CS III Position

Campbell alleges that, in January 2015, SJM denied her an

expected promotion from CS II to CS III.  Pl.'s Ex. 34; Collier
Decl. ¶ 21.  Campbell had been told by Collier's predecessor that
she would be eligible for a promotion to CS III within six to
twelve months of her hire date.  Collier Decl. Ex. C at 2.
Collier declined to promote Campbell, however, explaining that she
was ineligible for the promotion because she had only been a CS II
for less than a year.  Collier Decl. ¶ 21.  Collier told Campbell
that SJM policy requires an employee to be a CS II for at least two
years before he or she is eligible to move up to the CS III
position.  Id. ¶¶ 19, 21; Collier Decl. Ex. D.  The policy actually
states that the decision to elevate an employee from CS II to CS
III is "performance based" and that the time in service is "not a
requirement."  Collier Decl. Ex. D.

## V.   Performance Discussions

     On January 22, 2015, Collier met with Campbell to discuss the
CS III position and her performance.   After establishing that
Campbell would not receive a promotion, Collier raised concerns
about tension between Campbell and her co-workers.  Pl.'s Ex. 1 at
1.  Campbell then sent a lengthy email to HR - Colleen Pelton and
Lauren Hansen - describing her meeting with Collier, explaining her
strained relationship with Hutson, and defending her performance.
Id.  She further explained that she interpreted the meeting to be
a warning that her job was in jeopardy.  Id. at 2.  She told them
that she believed she was being retaliated against due to "jealousy

6

and/or inconvenience due to her pregnancy." Id. at 3. Campbell requested that HR assist her in addressing the situation. Id. Pelton testified that the email raised a concern about possible pregnancy discrimination that would normally warrant an investigation, but she does not recall what, if anything, SJM did to address the situation. Pelton Dep. at 64:14-66:8. It is unclear if HR reported Campbell's email to Collier.

On February 10, 2015, Collier sent Campbell an email with the subject line "Field Visit Follow Up," in which he noted his concerns about the "personal dynamics" of the Detroit team and disclosed that he had spoken to everyone on the team about the issue. Collier Decl. Ex. E at 1. Collier praised Campbell for her "openness and professionalism" during their January meeting and for promptly addressing the performance issues they discussed. Id. He specifically noted that the team was "off to a great start with addressing [the] issues." Id. Collier also raised specific concerns about Campbell's performance: (1) she needed to be available for meetings outside of normal working hours, (2) she needed to be more responsive to her teammates, and (3) she needed to work with her team regarding certain issues rather than asking him for assistance. Id. He then thanked Campbell for her professionalism and her "positive approach" to his concerns. Id. at 2.

According to Collier, the email constituted a memorandum of expectation (MOE). See id.; Collier Decl. ¶ 22. An MOE is a document that sets forth steps an employee needs to take to improve performance and avoid adverse employment action. Oefinger Dep. at 25:13-28:2. Campbell denies ever being told that email was an MOE. Campbell Dep. at 192:20-22. According to HR, it would be concerning for Collier to issue an MOE so soon after Campbell's report of possible pregnancy discrimination. Pelton Dep. at 73:1-11.

On February 13, 2015, Campbell responded to Collier via email. Campbell reiterated her commitment to working more effectively with her team, but challenged Collier's representations about her allegedly poor performance. Pl.'s Ex. 43 at 1. She expressed frustration that Collier had not raised those issue during their January meeting and that he failed to get her version of events before determining she was at fault. Id. She then responded to each area of concerns raised in Collier's email from her perspective. Id. at 1-2. She concluded the email by again stating her commitment to her work and her team. Id. at 2.

In late February, despite apparent improvements in team dynamics, Hutson continued to complain about Campbell to Collier. In a February 25, 2015, email she noted that one of Campbell's clients complained that she was too talkative while in the office and that Campbell still did not want to participate in after-hours

8

dinners and events.  Pl.'s Ex. 48.  Hutson requested that Collier not share the information with Campbell and explained that she doubted Campbell's longevity at SJM: "I have a feeling she won't come back after the baby so it's not worth getting things all riled up."  Id.

## V.  Performance Review

Collier completed Campbell's 2014 year-end performance review in early 2015.  Collier rated Campbell's performance as meeting expectations in most areas and exceeding expectations in a few areas.  See Collier Decl. Ex G.  With respect to teamwork and collaboration, however, he rated Campbell's performance below expectations.  Id. at 7.  Collier commented that Campbell "is a talent[ed] individual who can make an impact on our team" but noted the "team dynamics" problem within the Detroit team.  Id. at 8.  He noted his "confidence" that Campbell would work improve in that area.  Id. at 8.  Campbell, in contrast, evaluated her performance as largely exceeding expectations, even with respect to team work. Id. at 1-7.

On March 5, 2018, Campbell participated in a conference call with Collier and Robyn Dahl from HR to discuss her review. Campbell recorded the call without Collier's or Dahl's consent. She did so because she feared for her job and wanted to protect herself.  Campbell Dep. at 32:11-18; 33:18-34:2.  Campbell told Collier and Dahl that she was concerned about the discrepancy

between her self-evaluation and Collier's evaluation, particularly given her team's strong sales in 2014. Pl.'s Ex. 44 at 2:14-5:5; see also Hayes Decl. Ex. A. Collier explained that he is required to rank all of his employees, which prevents him from providing superlative reviews to each employee, even if earned. Pl.'s Ex. 44 at 3:22-4:9. Campbell also again expressed her frustration that she was being held responsible for unflattering reports by Hutson without being asked for her side of the story. Id. at 8:17-10:2. She suggested that her pregnancy was the reason for her poor treatment and reported that Hutson had warned her on more than one occasion that having a child while working at SJM could be career ending. Id. at 10:3-6; id. at 21:17-23; id. at 23:3-22. Dahl assured Campbell that SJM has never terminated someone for having a child. Id. at 24:8-11.

## VI. First EEOC Complaint

On March 19, 2015, Campbell filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging sex and pregnancy discrimination and retaliation for complaining about Dr. Radden's harassment. Pl.'s Ex. 45. SJM's response to the charge included a document purporting to be the MOE Collier sent to Campbell. Pl.'s Ex. 46-47. However, the document provided to the EEOC was different than the original email in several respects. Compare Pl.'s Ex. 46 with Collier Decl. Ex. E. First, it excludes the "Field Visit Follow Up" header and the email's

initial paragraph noting improvements in the areas of concern. <u>See</u> <u>id.</u> Second, it deleted reference to being "off to a great start" in addressing issues. Third, it added the words "without resistance or challenge" to the following sentence: "These are the requirements of the job and need to be executed without resistance or challenge." <u>See</u> <u>id.</u> According to Collier, the MOE submitted to the EEOC was an earlier draft of the email he sent to Campbell that must have been provided to the EEOC in error. Collier Dep. at 247:19-249:2.

**VII. Post-Maternity Leave**

Campbell went on maternity leave from April 22, 2015, to July 15, 2015. On her return to SJM, Collier reminded Campbell that the MOE was still in place. Collier Decl. Ex. J. Thereafter, Hutson and Collier documented numerous alleged performance issues similar to those raised before Campbell's maternity leave. <u>See</u> Collier Decl. ¶¶ 31-34; Hutson Decl. ¶¶ 15-22; Pl.'s Ex. 49. As before, Campbell denies having performance problems. <u>See, e.g.</u>, Collier Decl. Ex. K; Campbell Decl. ¶¶ 2-4.

On August 14, 2015, Campbell had a medical emergency that required her to go to the emergency room and thereafter miss several days of work. Campbell Dep. at 225:16-18; <u>see also</u> Pl.'s Ex. 51. That morning, Campbell was scheduled to work on a case with a client, Dr. Shuayto. She contacted Hutson and Anthony Ball at 6:17 a.m. to let them know she would not be able to work that

day due to an "emergency." Pl.'s Ex. 50. She did not immediately explain that the emergency was medical in nature. See id. Ball covered Dr. Shuayto's cases that morning, but they were delayed due to Campbell's last-minute absence. Shuayto Dep. at 19:3-9. Ball told Dr. Shuayto that Campbell could not be there and that he had been trying unsuccessfully to reach her. Id. at 19:12-21. Although Campbell sent a text to Ball later that morning letting him know that she was under a doctor's care, Ball did not share that information with Dr. Shuayto. Id. at 19:17-20:11. Dr. Shuayto was so upset that Campbell had failed to show up without explanation that he sent a letter to Hutson saying that he no longer wanted to work with Campbell because her "recent actions have resulted in less than desirable results." Hutson Decl. Ex. H. SJM never informed Dr. Shuayto that Campbell had a medical emergency that prevented her from working with him that day. Shuayto Dep. at 20:6-11. Dr. Shuayto testified that had he known about Campbell's hospitalization, he would not have requested that she no longer work with him. Id. at 20:12-21:14.

On August 19, 2015, Hutson reported to Collier that Dr. Shuayto would no longer work with Campbell because, in her words, she was not "reliable" and was "detrimental to their business and ours." Pl.'s Ex. 55 at 2. Hutson also complained to Collier that she could not send Campbell to the majority of the team's appointments due to her conflicts with Drs. Radden and Shuayto.

12

Pl.'s Ex. 54. In doing so, Hutson blatantly ignored the reasons for those conflicts.

**VII. Performance Improvement Plan and Termination**

Collier placed Campbell on a thirty-day performance improvement plan (PIP) a few days after Campbell's medical emergency. Collier Decl. Ex. M. Campbell acknowledged receiving the PIP, but disagreed that her performance was sub-par. Id. at 3. Even though she felt that the PIP was SJM's final step in the plan to terminate her, Campbell tried to meaningfully participate in the process. Campbell Dep. at 222:4-224:24. According to Hutson and Collier, however, she was unable to meet the demands of the PIP. See Collier Decl. Ex. L.

On August 26, 2015, Campbell filed a second charge of discrimination with the EEOC alleging retaliation for filing the original EEOC complaint. Pl.'s Ex. 61. On September 29, 2015, SJM terminated Campbell's employment for failing to successfully complete the PIP. Collier Decl. ¶ 39. Campbell thereafter filed a third charge of discrimination with the EEOC alleging sexual discrimination and retaliation for complaining about the discrimination. On May 11, 2016, the EEOC issued right to sue letters for all three charges of discrimination.

**VIII. This Lawsuit**

On July 21, 2016, Campbell commenced this action in the Eastern District of Michigan alleging pregnancy discrimination,

hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act and Michigan's corresponding Elliott-Larsen Civil Rights Act (ELCRA). The court granted SJM's motion to transfer the case here due to the forum selection clause in Campbell's employment agreement. See ECF No. 12. SJM thereafter asserted a counterclaim against Campbell alleging that her recording of the March 5, 2015, telephone call with Collier and Dahl violated the Illinois eavesdropping statute. SJM now moves for summary judgment and Campbell moves to dismiss the counterclaim.

## DISCUSSION

### I.  Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party.

_Id._ at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  _Celotex_, 477 U.S. at 324.  A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  _Celotex_, 477 U.S. at 322-23.

### A.  Pregnancy Discrimination Act Claim

The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), establishes that discrimination based on "pregnancy, childbirth, or related medical conditions" constitutes sex discrimination for the purposes of Title VII.  The ELCRA likewise prohibits discrimination based on pregnancy.[4]  Mich. Comp. Laws § 37.2202(1)(a)-(d).  A plaintiff claiming discrimination must either present direct evidence of the discrimination or satisfy the three-part burden-shifting test presented in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Fjelsta v. Zogg Dermatology, PLC</u>, 488 F.3d 804, 809 (8th Cir. 2007).

---

[4]  The court analyzes discrimination and retaliation claims under Title VII and the ELCRA identically.  <u>Sutherland v. Mich. Dep't of Treasury</u>, 344 F.3d 603, 614 n.4 (6th Cir. 2003).

Direct evidence "must be strong enough to show a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact-finder that an illegitimate criterion actually motivated the employment decision."  Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 965 (8th Cir. 2006)(alteration in original) (citation omitted).  Direct evidence can include "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that attitude was more likely than not a motivating factor in the employer's decision."  Yates v. Douglas, 255 F.3d 546, 548 (8th Cir. 2001).  However, "[n]ot every prejudiced remark made at work supports an inference of illegal employment discrimination."  Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr., 133 F.3d 616, 619 (8th Cir. 1998).  Courts distinguish between "stray remarks in the workplace, ... statements by decisionmakers unrelated to the decisional process, ... [and] direct evidence of discrimination."  Id.

Campbell argues that Hutson made two comments that constitute direct evidence of pregnancy discrimination.  First, Hutson told Campbell that she was concerned that getting pregnant could negatively affect her career because she had heard that SJM fired a woman after she returned from maternity leave.  Second, Hutson

16

told Collier that she did not believe Campbell would return to work after maternity leave. SJM denies that the comments are direct evidence of discrimination because Hutson was not involved in the decision to terminate Campbell and because there is no link between the statements and Campbell's termination. Although a close call given Hutson's many complaints to Collier about Campbell, the court agrees with SJM that the comments, standing alone, are insufficient to definitively establish that "an illegitimate criterion actually motivated the employment decision." Schierhoff, 444 F.3d at 965. They are relevant, however, to Campbell's claim as analyzed under McDonnell Douglas.

Under McDonnell Douglas, Campbell must first establish a prima facie case of discrimination by showing that she: 1) is a member of a protected group, 2) was qualified for her position, 3) suffered an adverse employment action, and 4) was discharged under circumstances giving rise to an inference of discrimination. Wierman v. Casey's Gen. Stores, 638 F.3d 984, 993 (8th Cir. 2011). If Campbell meets her burden, the burden of production shifts to SJM "to articulate a non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." Id. If SJM then meets its burden, Campbell "must then produce evidence sufficient to create a genuine issue of material fact showing that [SJM's] explanation is merely a pretext for unlawful discrimination." Id. "[T]he issue is whether the plaintiff has

sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action."  <u>Id.</u>

### 1.  Prima Facie Case

There is no question that SJM's decision not to promote Campbell and later to terminate her constituted adverse employment actions.  The parties dispute whether Campbell has established the remaining three elements of her prima facie case. A reasonable jury could conclude that Campbell has met her burden.

As a threshold matter, there are sufficient facts to establish that Campbell was a member of a protected group at the time of her termination.  The court recognizes that pregnancy "differs from most other protected attributes in that it is not immutable" because "at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions." <u>Sura v. Stearns Bank, N.A.</u>, No. 01-1344, 2002 WL 31898167, at *5 (D. Minn. Dec. 18, 2002) (citation and quotation marks omitted).  "[A] woman who is not pregnant at or very near the time when an adverse employment action is taken against her must demonstrate that the effects of her pregnancy continued to exist at the time she was [subject to the action], either in actual fact or in the thoughts and actions of those responsible." <u>Id.</u> (quoting <u>Solomen v. Redwood Advisory Co.</u>, 183 F. Supp. 2d 748, 753 (E. D. Pa. 2002)) (alteration in original).

Here, there is sufficient evidence of a causal nexus tying Campbell's pregnancy to her eventual termination. SJM terminated Campbell less than three months after she returned from maternity leave, which is sufficiently close in time to establish a connection between her pregnancy and her termination. See Helmes v. S. Colonie Cent. Sch. Dist., 564 F. Supp. 2d 137, 147 (N.D.N.Y. 2008) (concluding that denial of tenure nine weeks after returning from maternity leave was sufficiently close in time to establish protected class status under the circumstances). Further, the alleged discrimination began with her pregnancy announcement, continued throughout her pregnancy, and ended with her termination soon after she returned from maternity leave. As a result, the record supports a finding that there was a connection between Campbell's pregnancy and SJM's adverse employment decisions, and thus that she was a member of a protected group.

There is also no genuine dispute that Campbell was qualified for her position and at least nominally qualified for the TM and CS III positions. See McGinnis v. Union Pacific R.R., 496 F.3d 868, 874 n.2 (8th Cir. 2007) (citation and quotation marks omitted) ("Under the qualification prong, a plaintiff must show only that he possesses the basic skills necessary for performance of the job....").

Third, the record supports a finding that Campbell was denied promotions and eventually terminated under circumstances giving

rise to an inference of discrimination. As set forth in detail above, Campbell has credibly supported her theory that her pregnancy triggered a narrative designed to lead to her termination. Before Campbell announced her pregnancy, she was highly regarded and lauded for her role in achieving excellent sales for the Detroit team. That allegedly changed when she told Hutson and Collier she was pregnant. Thereafter and until SJM terminated Campbell, Hutson routinely complained about Campbell's performance despite her continued sales success and even commented that she did not believe Campbell would return to work after having her baby. Collier appears to have accepted Hutson's version of events without talking to Campbell. When Campbell tried to defend herself, Collier simply instructed her to improve her performance.[5]

Collier also declined to consider Campbell for a TM and CS III position during her pregnancy despite earlier indications that Campbell was well suited for either position. SJM has provided neutral explanations for Collier's decisions to do so, but given the competing evidence, the court must resolve the matter in Campbell's favor. As a result, Campbell has set forth ample facts from which a jury could conclude that SJM denied her promotions and eventually terminated her due to her pregnancy.

---

[5] Although there were legitimate issues within the Detroit team with respect to communication and teamwork, the record supports a finding that Collier placed undue blame on Campbell.

## 2. Non-Discriminatory Reason for Termination

An employer's burden of showing a legitimate, nondiscriminatory reason for termination is not onerous. Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 954 (8th Cir. 2012). SJM has provided sufficient evidence to meet this low burden. Thus, the burden shifts back to Campbell to demonstrate that SJM's proffered explanation is pretextual, and that discrimination is the true reason for the adverse action.

## 3. Evidence of Pretext

"There are at least two ways [Campbell] may demonstrate a material question of fact regarding pretext." Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011). "She may show that [SJM's] explanation is unworthy of credence because it has no basis in fact, or she may show pretext by persuading the court that discriminatory animus more likely motivated [SJM]." Guimaraes v. SuperValue, Inc., 674 F.3d 962, 975 (8th Cir. 2012) (citation omitted). "Either route amounts to showing that a prohibited reason, rather than [SJM's] stated reason, actually motivated" her termination. Id. (citation and quotation marks omitted).

Campbell has set forth ample facts credibly challenging SJM's stated non-discriminatory reasons for its adverse employment actions. There are, at a minimum, genuine questions as to the accuracy and extent of the performance issues identified by SJM, which served as the basis for its decisions to deny Campbell

promotions and to terminate her.  The court will not repeat each material fact in dispute, but notes that there are many.  A jury, and not the court, must consider those facts and decide whether SJM's stated reasons for it adverse employment actions were pretextual.  As a result, the record precludes summary judgment on Campbell's pregnancy discrimination claim.

**B.  Hostile Work Environment**

Campbell claims that she was subject to a hostile work environment due to Dr. Radden's sexual harassment.  SJM argues that Campbell has not met the high bar for establishing such a claim. The court agrees.

In order to establish a hostile work environment claim, a plaintiff must show: (1) that she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a casual nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition or privilege of her employment.  <u>Gordon v. Shafer Contracting Co., Inc.</u>, 469 F.3d 1191, 1195–96 (8th Cir. 2006).  When a hostile work environment claim is based on the acts of a non-supervisor, a plaintiff "must show that [her] employer knew or should have known of the harassment and failed to take proper action."  <u>Id.</u> at 1195.

SJM argues that Campbell has failed to allege facts showing that the harassment affected a term, condition, or privilege of her employment.  In deciding that issue, the court looks at all the

circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002). A plaintiff "must demonstrate that the harassment was sufficiently severe or pervasive to create a work environment that [is] both objectively and subjectively hostile." Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 908 (8th Cir. 2003) (citations omitted). A hostile work environment does not exist when the "offensive conduct consists of offhand comments and isolated incidents." Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759 (8th Cir. 2004) (citation and quotation marks omitted).

Here, notwithstanding Dr. Radden's plainly inappropriate conduct, the court cannot conclude that Campbell was subject to a hostile work environment. The incident was isolated and SJM ensured that Campbell did not have to work with Dr. Radden again. Although SJM did not handle the incident as Campbell preferred, SJM acted reasonably in simply removing Campbell from Dr. Radden's service. Indeed, SJM's options were limited given that Dr. Radden was not its employee. As a result, the court will grant summary judgment on this claim.

## C.  Retaliation Claim

As noted above, in the absence of direct evidence of retaliation, the court examines Campbell's claim under the three-part McDonnell Douglas burden-shifting analysis.  Bainbridge, 378 F.3d at 760.  To establish a prima facie case of retaliation, "a plaintiff must show (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action; and (3) a causal connection ... between the two events."  Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006) (citation and quotation marks omitted).  To establish a causal connection, plaintiffs must present evidence that gives rise to an inference of retaliatory motive.  Kipp v. Mo. Hwy. & Trans. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002).

Campbell engaged in protected activity when she filed the EEOC complaints, reported Dr. Radden's sexual harassment, and complained to HR about possible pregnancy discrimination.  See McClure v. Career Sys. Dev. Corp., 447 F.3d 1133, 1137 (8th Cir. 2006) ("Filing an employment discrimination complaint is a protected activity."); Becker v. Josten's, Inc., 210 F. Supp. 3d 1110, 1120 (D. Minn. 2016) (holding that complaining to an employer about sexual harassment constitutes protected activity).  The failure to promote and termination plainly constitute adverse employment actions, and the court will assume that the purported MOE and PIP constitute adverse employment actions.  See Kim v. Nash Finch Co.,

24

123 F.3d 1046, 1060 (8th Cir. 1997) ("[R]etaliatory conduct may consist of action less severe than outright discharge." (citation and quotation marks omitted)).  The court also concludes that there is a genuine issue of material fact as to whether Campbell has established a causal connection between the protected activity and the adverse employment consequences.

The temporal proximity between her protected activity and the adverse employment consequences alone could support a finding of causation.  Moreover, as discussed, Campbell has adduced sufficient facts to undermine SJM's stated reasons for its actions, which gives rise to an inference of retaliatory motive.  Campbell has therefore established a prima facie case of retaliation.

SJM has offered a legitimate, non-retaliatory reason for its actions, but Campbell has provided ample evidence of pretext as set forth above.  As a result, the court must deny summary judgment on the retaliation claim.

## II. Motion for Judgment on the Pleadings/Summary Judgment

SJM has brought a counterclaim alleging that Campbell violated the Illinois eavesdropping statute by recording a telephone conversation with Collier, an Illinois resident.  The facts underlying the counterclaim are straightforward.

On March 5, 2015, Campbell recorded a work-related conference call with Dahl and Collier without their consent.  All parties joined the call through SJM's phone conferencing system.  Campbell

Decl., ECF No. 73-7, ¶¶ 6-8.  At the time of the call, Campbell was in Michigan, Dahl was in Texas, and Collier was in Illinois.  <u>Id.</u> ¶ 9; Collier Decl., ECF No. 106, ¶ 7.  Campbell did not know where Dahl or Collier were located at the time of the call.  Campbell Decl. ¶ 11.  SJM policy prohibits employees from recording conversations without each party's consent.[6]  Pl.'s Ex. 63 at 8.

## A.   Standard of Review

The same standard of review applies to motions under Federal Rules of Civil Procedure 12(c) and 12(b)(6).  <u>Ashley Cty., Ark. v. Pfizer, Inc.</u>, 552 F.3d 659, 665 (8th Cir. 2009).  Thus, to survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Braden v. Wal-Mart Stores, Inc.</u>, 588 F.3d 585, 594 (8th Cir. 2009) (citation and quotation marks omitted).   "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Although a complaint need not contain detailed factual allegations, it must raise a right to relief above the speculative level.  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  "[L]abels and conclusions or a formulaic recitation of the elements of a cause of

---

[6] Whether Campbell knowingly violated SJM policy in recording the conversation has no bearing on her potential liability under the statute.

action" are not sufficient to state a claim. Iqbal, 556 U.S. at 678 (citation and quotation marks omitted).

**B.   Merits**

A person violates the Illinois eavesdropping statute when she, without law enforcement justification, "[k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation ... unless [s]he does so ... with the consent of all of the parties to such conversation." Int'l Profit Assocs., Inc. v. Paisola, 461 F. Supp. 2d 672, 678 (N.D. Ill. 2006) (quoting 720 Ill. Comp. Stat. § 5/14-2(a)). Further, "when communications with individuals acting as agents or representatives of a company are taped in violation of the Illinois eavesdropping statute, claims under the eavesdropping statute belong to the company." Id. at 678 n.7. Campbell makes several arguments as to why the Illinois eavesdropping statute should not apply. Even assuming it does, however, the counterclaim fails on the merits.

Civil remedies under the eavesdropping statute include: (1) an injunction prohibiting further eavesdropping, (2) actual damages, and (3) punitive damages. 720 Ill. Comp. Stat. §§ 5/14-6(a)-(c). Although SJM seeks actual and punitive damages,[7] it has failed to establish that is entitled to either.

_____

[7] For obvious reasons, SJM does not seek to enjoin Campbell from recording future conversations.

SJM has not disclosed any actual damages or the amount it claims to have been harmed in its responses to discovery, which closed months ago. With respect to punitive damages, SJM must establish that Campbell acted with "malice, violence, oppression or wanton recklessness" or that "the act complained of partakes of a criminal or wanton nature." By-Prod Corp. v. Armen-Berry Co., 668 F.2d 956, 961–62 (7th Cir. 1982). The record does not support a finding that Campbell's decision to record the telephone conference met this very high bar. Campbell feared for her job and recorded the call to protect herself. There is no evidence of malice, violence, oppression, or wanton recklessness. As a result, SJM has not established that it suffered any actual or punitive damages that would entitle it to relief under the eavesdropping statute, and the counterclaim must be dismissed.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. The motion for summary judgment [ECF No. 64] is granted in part as set forth above; and

2. The motion for judgment on the pleadings [ECF No. 71] is granted.

Dated: November 2, 2018

s/David S. Doty
David S. Doty, Judge
United States District Court